Green v. Condra, 2009 NCBC 21.

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 6575

W. GREG GREEN and DR. KENNETH
ELLINGTON, individually and
Derivatively on Behalf of MedOasis, Inc.,

Plaintiffs,

v.

KEN CONDRA, DANIEL PREVOST,
MARC MILLER, and PETER
FONTAINE, individually and as current
or former directors of MEDOASIS, INC.,
and TIM LONGBINE and DAVID
PHILLIPS in their capacity as current or
former directors of MEDOASIS, INC.,

Defendants,

And

MEDOASIS, INC., a North Carolina
Corporation,

Nominal
Defendant.

ORDER & OPINION

*Burr & Forman LLP by John O'Shea Sullivan and Anderson Terpening PLLC by William R. Terpening for Plaintiffs.*

*Brown Law LLP by Gregory W. Brown and Joshua M. Hiller for Defendants.*

Diaz, Judge.

{1}     Before the Court is the Motion of Defendants Ken Condra ("Condra"), Daniel Prevost ("Prevost"), Marc Miller ("Miller"), Peter Fontaine ("Fontaine"), Tim Longbine ("Longbine"), and David Phillips ("Phillips"), collectively "Defendants," to Dismiss Plaintiffs' Complaint pursuant to Rules 9(b) and 12(b)(6) of the North Carolina Rules of Civil Procedure ("the Motion to Dismiss").

{2}     After considering the Court file, the Motion to Dismiss, the briefs,[1] and the arguments of counsel, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion.

## I.
## PROCEDURAL BACKGROUND

{3}     On 16 December 2008, Plaintiffs filed their Complaint in this case.

{4}     On 16 January 2009, Defendants designated this case as mandatory complex business, and it was assigned to me on 21 January 2009.

{5}     On 27 February 2009, Defendants filed the Motion to Dismiss and supporting brief.

{6}     Plaintiffs filed a response brief on 27 March 2009.

{7}     Defendants filed their reply brief on 17 April 2009.

{8}     The Court heard oral argument on the Motion on 22 April 2009.

## II.
## THE FACTS[2]
## A.
## THE PARTIES

{9}     Plaintiff W. Greg Green ("Green") is a shareholder of MedOasis, Inc. ("MedOasis" or "the Company") who has continually held MedOasis stock since 2002.  (Compl. ¶ 2.)

{10}    Green previously served on the board of MedOasis (the "Board") and as MedOasis' CEO.  (Compl. ¶ 2.)

{11}    Plaintiff Kenneth Ellington, M.D. ("Ellington") is a shareholder of MedOasis who has continually held MedOasis stock since 2002.  (Compl. ¶ 3.)

---

[1] Attached to Defendants' brief in support of the Motion to Dismiss are three (3) exhibits:  Plaintiffs' 10 September 2008 pre-suit demand letter and two (2) sets of Company Board meeting minutes.  At the hearing of this matter, Plaintiffs agreed that the Court could consider these materials without converting the Motion to Dismiss into a motion for summary judgment.

[2] The facts are taken from Plaintiffs' Complaint, which the Court accepts as true for purposes of resolving the Motion.

{12}  Ellington previously served on the Board.  (Compl. ¶ 3.)

{13}  Nominal Defendant MedOasis is a North Carolina corporation with its principal place of business in Asheville, North Carolina.  (Compl. ¶ 4.)

{14}  MedOasis provides billing and collection services to anesthesiologist practices.  (Compl. ¶ 12.)

{15}  Defendant Condra is the Company's CEO, and he also serves on the Board. (Compl. ¶ 5.)

{16}  Defendant Prevost is a Company officer and a member of the Board. (Compl. ¶ 6.)

{17}  Defendant Miller is the former CEO of the Company and a former Board member.  (Compl ¶ 7.)

{18}  Defendant Fontaine serves as the current chairman of the Board.  (Compl. ¶ 8.)

{19}  Defendant Longbine has served on the Board since 5 August 2008. (Compl. ¶ 9.)

{20}  Defendant Phillips also serves on the Board.  (Compl. ¶ 10.)

B.

THE CLAIMS

{21}  In 2000, Plaintiff Green was a consultant for Asheville Anesthesia Associates ("AAA").  (Compl. ¶ 13.)  Green later became AAA's CEO.  (Compl. ¶ 13.)

{22}  MedOasis was incorporated on or about 11 December 2001 as Medical Specialty Services, Inc.  (Compl. ¶ 14.)

{23}  Green created the Company to manage the billing and collection services of AAA, as well as other anesthesiology practices.  (Compl. ¶¶ 12–13.)

{24}  The Company's Articles of Incorporation (the "Articles") authorized MedOasis to issue up to one million (1,000,000) shares of common stock.  (Compl. ¶ 14; Compl., Ex. A, at 1.)

{25}  There was no provision in the Articles for any other class of stock, nor were there any provisions addressing the redemption of shares.  (Compl. ¶ 14; Compl., Ex. A, at 1.)

{26} The Company's original Bylaws, however, did contain a provision governing redemption of shares that would be triggered by certain events, "including the termination of a Management Services Agreement between [the Company] and a client medical practice in which the shareholder holds [an] ownership interest or is an employee." (Compl. ¶ 19.)

{27} On or about 19 November 2002, MedOasis issued 26,000 shares to Green. (Compl. ¶ 16.)

{28} The Company issued an additional 174,000 shares to Green in or around 2004. (Compl. ¶ 16.)

{29} As part of the Company's business model, the physicians in the anesthesia groups serviced by the Company participated as shareholders in the Company. (Compl. ¶ 17.) Accordingly, MedOasis issued 26,000 shares to Ellington, who was a physician at AAA, on or about 19 November 2002. (Compl. ¶¶ 15, 17.)

{30} Green and Ellington also served on the Board. (Compl. ¶ 14.)

{31} In November 2005, the Board removed Green as CEO of MedOasis at a special meeting of the Board. (Compl. ¶ 20.) Additionally, Green and Ellington were removed from the Company's Board. (Compl. ¶ 20.)

{32} Green and Ellington, however, retained their shares after being voted off the Board. (Compl. ¶ 20.)

{33} In February 2006, the Board offered to purchase Green's 200,000 shares for $0.898 per share. (Compl. ¶ 22.)

{34} At the time of the offer, Defendant Miller—MedOasis' CEO at the time (Compl. ¶ 22; Pls'. Mem. Law Opp'n Defs'. Mot. Dismiss 3–4 & n.5)—valued the shares at $0.99 per share. (Compl. ¶ 22.)

{35} Green refused the Board's offer to purchase his shares. (Compl. ¶ 22.)

{36} On 13 August 2006, Ellington ceased to be a AAA physician, but he retained his shares in MedOasis. (Compl. ¶ 23.)

{37} MedOasis has not held an annual shareholders' meeting since October 2006. (Compl. ¶ 24.) As such, there have been no elections for directors as provided

for in the Company's Bylaws, and only one current Board member was elected at an annual meeting of its shareholders. (Compl. ¶ 24.)

{38} Since Green and Ellington were removed from the Board, the Company has failed to provide any financial information to its shareholders. (Compl. ¶ 24.)

{39} In October 2006, MedOasis amended its Articles to increase the number of authorized shares from 1 million to 1.5 million. (Compl. ¶ 26; Compl., Ex. B.)

{40} On or about 3 July 2007, the Board adopted new Bylaws. (Compl. ¶ 27; Compl., Ex. C.)

{41} On or about 31 March 2008, MedOasis named Ken Condra as its CEO and awarded him 60,000 shares, which shares (according to Plaintiffs) did not become fully vested until 31 December 2008. (Compl. ¶ 29.)

{42} On 31 May 2008, MedOasis terminated AAA's Management Services Agreement. (Compl. ¶ 30.)

{43} AAA was the oldest and most profitable client of the Company. (Compl. ¶ 30.)

{44} On 23 June 2008, MedOasis wrote to Ellington to advise him that a provision in the amended Bylaws made it necessary for the Company to redeem Ellington's shares in light of the Company's termination of AAA's Management Services Agreement. (Compl. ¶¶ 31–32.)[3]

{45} The Company retained Dixon Hughes CPAs ("Dixon Hughes") to render a valuation opinion for the shares to be redeemed. (Compl. ¶ 33.)

{46} Dixon Hughes told MedOasis management that the shares were valued between $0.00 and $0.40 per share. (Compl. ¶ 33.)

{47} The Company thereafter set the redemption share price at $0.17 per share. (Compl. ¶ 33.)

{48} The Company's 23 June 2008 letter to Ellington advised him that he would receive a check in the amount of $4,420.00 for his shares if Ellington complied with certain conditions, which included signing an agreement to indemnify the Company and release it (and its officers and directors) from all claims. (Compl. ¶¶ 34–35.)

---

[3] The Company sent similar redemption letters to other shareholders. (Compl. ¶¶ 31–32.)

{49}  Ellington did not agree to the redemption.  (Compl. ¶ 35.)

{50}  In July 2008, twenty (20) shareholders, each of whom received similar redemption notices from the Company, granted Ellington "irrevocable proxies to act, vote and execute consents with respect to all of their shares of MedOasis as fully and to the same extent and effect as those shareholders would be entitled to act, vote and execute consents themselves."  (Compl. ¶ 38.)

{51}  The proxies granted to Ellington totaled 481,000 shares (the "AAA Shares").  (Compl. ¶ 38.)

{52}  On 4 August 2008, Green sent MedOasis a demand for a special meeting of the Company's shareholders, to be held 16 August 2008, for the following purposes: "(a) deletion from the amended Bylaws of the last two sentences of Article V, Section 2, first paragraph;[4] (b) removal of one or more members of [the Board]; and (c) election of a new Board of Directors."  (Compl. ¶ 37.)

{53}  In response to Green's demand, the Board called an emergency meeting for 5 August 2008 at 7:55 p.m.  (Compl. ¶ 39.)

{54}  Condra, Prevost, Phillips, Evans, Fontaine, and Longbine were present at the 5 August 2008 meeting.  (Compl. ¶ 39.)

{55}  At this meeting, the Board discussed the voting power of Green and Ellington at the upcoming shareholder meeting, who, combined, would control and vote 707,000 of the Company's shares.  (Compl. ¶ 40)

{56}  At the time, the Board controlled the remaining 440,109 of the 1,147,109 shares that were issued and outstanding.  (Compl. ¶ 40.)

{57}  The Board determined at the 5 August 2008 meeting that neither Ellington nor the AAA Shares, as a group, would have any voting rights at the upcoming shareholder meeting.  (Compl. ¶ 41.)

{58}  The Board also decided that it would not give notice of the shareholder meeting to Ellington or any of the shareholders who had granted Ellington a proxy.  (Compl. ¶ 41.)

---

[4] These provisions in the amended Bylaws required that at least two (2) members of the Board be members of the Company's management team.  (Compl., Ex. C, at 4.)

{59} Furthermore, the Board voted to issue 140,000 shares each to Condra and Prevost at a price well below their market value or fair value. (Compl. ¶ 42.)[5] As a result, the Board controlled a majority of the issued and outstanding shares. (Compl. ¶ 42.)

{60} On 7 August 2008, the Company sent notice of the special shareholder meeting set for 18 August 2008. (Compl. ¶ 48.)

{61} Neither Ellington nor the shareholders who granted him proxies received notice of the shareholder meeting. (Compl. ¶ 48.)

{62} The Board also failed to set a record date for shares entitled to vote at the special shareholder meeting. (Compl. ¶ 46.)

{63} At the 18 August 2008 shareholder meeting, Ellington tendered the original proxies to the Board, but the Company refused to allow Ellington to vote his shares or those granted to him by proxy. (Compl. ¶ 49.)

{64} Over the objections of Green and Ellington, the Board allowed Condra and Prevost to vote the 280,000 shares that were issued to them at the 5 August 2008 emergency Board meeting, and also allowed Condra to vote the 60,000 shares issued to him in March 2008. (Compl. ¶ 50.)

{65} After tallying the votes allowed to be cast, the Company determined that Green's first two (2) motions—deleting the portion of the Bylaws requiring two (2) Board members to be members of the Company's management team and removing members of the Board—failed. (Compl. ¶ 51.) The Company refused to allow a vote on Green's third motion to elect a new Board. (Compl. ¶ 51.)

{66} On 10 September 2008, Plaintiffs made written demand on the Company to take suitable action with respect to the actions taken by the Board immediately before and during the shareholder meeting. (Compl. ¶ 52.)

{67} The Company did not respond to Plaintiffs' written demand. (Compl. ¶ 52.)

---

[5] Condra and Prevost executed promissory notes for the newly issued shares. (Compl. ¶ 43.)

## III.

## CONTENTIONS OF THE PARTIES

## A.

## DEFENDANTS' CONTENTIONS

{68} Defendant Miller contends that the Complaint should be dismissed as against him because he was not a director, officer, or employee of the Company during the relevant time periods. (Mem. Law Supp. Defs'. Mot. Dismiss 5, 19.)

{69} All Defendants contend that Plaintiffs' derivative claims (Counts I–VIII of the Complaint) fail to state a claim on which relief may be granted. (Mem. Law Supp. Defs'. Mot. Dismiss 4.)

{70} Specifically, Defendants contend that, while these claims are crafted as a demand for damages inflicted upon MedOasis, they are, in fact, based on Plaintiffs' allegations that they themselves were treated unfairly. (Mem. Law Supp. Defs.' Mot. Dismiss 4, 6–9.)

{71} In their reply, Defendants also contend that the derivative claims should be dismissed because Plaintiffs did not make an adequate pre-suit demand on the Board. (Reply Supp. Defs'. Mot. Dismiss 2–4.)

{72} Defendants also contend that Plaintiffs fail to allege that Defendants acted in bad faith, were uninformed, or did not believe they were acting in the best interests of MedOasis and, therefore, have failed to overcome Defendants' immunity under the business judgment rule. (Mem. Law Supp. Defs'. Mot. Dismiss 4, 9–13.)

{73} Defendants argue separately that Counts III, IV, and VI—abuse of control, gross mismanagement, and corporate waste, respectively—should be dismissed because North Carolina law does not recognize such assertions as distinct claims. (Mem. Law Supp. Defs'. Mot. Dismiss 5, 13.)[6]

{74} Defendants contend further that Count VII should be dismissed because Plaintiffs have failed to state a claim for unjust enrichment, in that Plaintiffs fail to allege which particular Defendant was unjustly enriched and fail to identify the

---

[6] On page 5 of their opening brief, Defendants erroneously refer to "Counts II, IV, and VI" instead of Counts III, IV, and VI.

benefit such Defendant purportedly obtained from MedOasis. (Mem. Law Supp. Defs'. Mot. Dismiss 5, 13–15.)

{75} Defendants contend that Plaintiffs' derivative claim for rescission should be dismissed because such a claim sounds in fraud, which Plaintiffs have failed to allege with the particularity required by Rule 9(b) of the North Carolina Rules of Civil Procedure. (Mem. Law Supp. Defs'. Mot. Dismiss 5, 15–16.)

{76} Defendants also contend the Court should dismiss all claims alleged against the Defendants in their individual capacities because Plaintiffs fail to allege facts that would overcome the immunity they possess pursuant to North Carolina law and the Company's Articles. (Mem. Law Supp. Defs'. Mot. Dismiss 5, 16–19.)

{77} Defendants further contend the Court should dismiss Plaintiffs' direct claim for breach of fiduciary duty (Count IX) because Plaintiffs have not alleged the existence of a recognizable fiduciary duty the director-Defendants owe to Plaintiffs as shareholders of MedOasis. (Mem. Law Supp. Defs'. Mot. Dismiss 5, 19–21.)

{78} Finally, Defendants urge the Court to dismiss Plaintiffs' direct claim for constructive fraud because Plaintiffs have failed to allege the facts and circumstances that would create a relationship of trust and confidence between Plaintiffs and Defendants and have failed to allege the circumstances of the alleged fraud and deceit with the required particularity. (Mem. Law Supp. Defs'. Mot. Dismiss 5, 21–23.)

B.

PLAINTIFFS' CONTENTIONS

{79} Plaintiffs, on the other hand, contend that their Complaint sufficiently alleges an injury to MedOasis and, therefore, alleges proper derivative claims. (Pls'. Mem. Law. Opp'n Defs'. Mot. Dismiss 9–11.)

{80} Plaintiffs argue that the business judgment rule is not implicated because they have alleged that Defendants' actions were self-interested and that their actions served no legitimate business purpose. (Pls'. Mem. Law. Opp'n Defs'. Mot. Dismiss 13.) They also allege that the Board's actions to protect itself from being

removed by shareholders are not protected by the business judgment rule. (Pls'. Mem. Law. Opp'n Defs'. Mot. Dismiss 13–14.)

{81} With respect to Plaintiff's claims for abuse of control, gross mismanagement, and corporate waste (Counts III, IV, and VI), Plaintiffs contend North Carolina courts have recognized these claims and, alternatively, that they are "varieties of breach of fiduciary duty." (Pls'. Mem. Law. Opp'n Defs'. Mot. Dismiss 21–22.)

{82} Plaintiffs contend they have stated valid claims for constructive fraud and rescission in that they have alleged a breach of Defendants' fiduciary duties and resulting damage to the Company, and that Rule 9(b) imposes no heightened pleading requirements for constructive fraud. (Pls'. Mem. Law. Opp'n Defs'. Mot. Dismiss 23–24.)

{83} Plaintiffs further contend Defendants are not immune from liability because an exculpation clause cannot save a director from the following types of allegations, all of which are alleged in the Complaint: self-dealing; self-interested transactions; participation in a transaction from which he derived an improper personal benefit; or conspiracy to violate fiduciary duties of care, loyalty, candor and/or independence. (Pls'. Mem. Law. Opp'n Defs'. Mot. Dismiss 19–21.)

{84} Finally, Plaintiffs contend their direct claims for breach of fiduciary duty and constructive fraud are valid because majority shareholders owe a fiduciary duty to minority shareholders and that minority shareholders in a closely held corporation may bring individual actions against directors in certain circumstances, such as those at issue in this case. (Pls'. Mem. Law. Opp'n Defs'. Mot. Dismiss 24–26.)

## IV.

## PRINCIPLES OF LAW

### A.

### RULE 12(b)(6) MOTION TO DISMISS

{85} The essential question on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure is "'whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory.'" *Craven v. Cope*, 188 N.C. App. 814, 816, 656 S.E.2d 729, 731–32 (2008) (*quoting Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 480, 593 S.E.2d 595, 598 (2004)).

{86} To that end, "'[t]he complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief.'" *Id.* at 86, 656 S.E.2d at 731–32 (italicized in original) (*quoting Hunter*, 162 N.C. App. at 480, 593 S.E.2d at 598). Nevertheless,

> [d]ismissal under Rule 12(b)(6) is proper when one or more of the following three conditions is satisfied: (1) when on its face the complaint reveals no law supports plaintiff's claim; (2) when on its face the complaint reveals the absence of fact sufficient to make a good claim; and (3) when some fact disclosed in the complaint necessarily defeats plaintiff's claim.

*Johnson v. Bollinger*, 86 N.C. App. 1, 4, 356 S.E.2d 378, 380 (1987) (*citing Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985)).

{87} Further, "when the allegations in the complaint give sufficient notice of the wrong complained of, an incorrect choice of legal theory should not result in dismissal of the claim if the allegations are sufficient to state a claim under some legal theory." *Stanback v. Stanback*, 297 N.C. 181, 202, 254 S.E.2d 611, 625 (1979).

B.

## NORTH CAROLINA'S DEMAND REQUIREMENT

{88}   Pursuant to North Carolina's demand requirement:

> No shareholder may commence a derivative proceeding until:  (1) [a] written demand has been made upon the corporation to take suitable action; and (2) 90 days have expired from the date the demand was made unless, prior to the expiration of the 90 days, the shareholder was notified that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

N.C. Gen. Stat. § 55-7-42 (2007).

{89}   A plaintiff's failure to satisfy this demand requirement constitutes an "insurmountable bar" to recovery.  *See Allen v. Ferrera*, 141 N.C. App. 284, 287, 540 S.E.2d 761, 764 (2000) (*citing Roney v. Joyner*, 86 N.C. App. 81, 356 S.E.2d 401 (1987)).

C.

## FIDUCIARY DUTIES OF A DIRECTOR

{90}   "Under North Carolina law, directors of a corporation generally owe a fiduciary duty *to the corporation*, and where it is alleged that directors have breached this duty, the action is properly maintained *by the corporation* rather than any individual creditor or stockholder."  *Keener Lumber Co., Inc. v. Perry*, 149 N.C. App. 19, 26, 560 S.E.2d 817, 822 (2002) (*citing Underwood v. Stafford*, 270 N.C. 700, 703, 155 S.E.2d 211, 213 (1967)).[7]

{91}   Specifically, a director is required to discharge his duties as a director "(1) [i]n good faith; (2) [w]ith the care an ordinarily prudent person in a like position

---

[7] As the leading commentator on North Carolina corporation law has noted, the drafters of the North Carolina Business Corporation Act of 1990

> recognized that directors have a duty to act for the benefit of all shareholders of the corporation, but they intended to avoid stating a duty owed directly by the directors to the shareholders that might be construed to give shareholders a direct right of action on claims that should be asserted derivatively.

Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.01[2], at 14-4 (7th ed. 2008) (*citing* N.C. Commentary § 55-8-30 (1989) (second paragraph)).

would exercise under similar circumstances; and (3) [i]n a manner he reasonably believes to be in the best interests of the corporation."  N.C. Gen. Stat. § 55-8-30(a) (2007).

{92}   In North Carolina, corporations may adopt provisions in their Articles of Incorporation that limit or eliminate personal liability of the corporation's directors for monetary damages for a breach of any duty, with certain exceptions.  *See* N.C. Gen. Stat. § 55-2-02(b)(3) (2007).  An exculpatory provision, however,

> cannot limit or eliminate liability with respect to (1) acts or omissions that the director at the time of such breach knew or believed were clearly in conflict with the best interests of the corporation; (2) any liability under [section 55-8-33 of the North Carolina General Statutes] for unlawful distributions; (3) any transaction from which the director derived an improper personal benefit; or (4) acts or omissions occurring prior to the date that the provision in the articles of incorporation became effective.

Russell M. Robinson, II, *supra*, at § 18.12 (footnote omitted); *see* N.C. Gen. Stat. § 55-2-02(b)(3).

{93}   Essentially, section 55-2-02(b)(3) permits the shareholders of a corporation to limit or eliminate a breach of the duty of care as the basis of a claim for money damages.  Robinson, *supra*, at § 18.12.  It does not allow shareholders to limit or eliminate injunctive relief against directors, nor does it allow shareholders to limit or eliminate liability for breaches of the directors' duties of loyalty or good faith.  *Id.*

D.

THE BUSINESS JUDGMENT RULE

{94}   North Carolina recognizes the business judgment rule.  This rule

> "operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose."

*Hammonds v. Lumbee River Elec. Mbrshp. Corp.*, 178 N.C. App. 1, 20–21, 631 S.E.2d 1, 13 (2006) (*quoting* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law*, § 14.06, at 14-16 to 14-17 (2005)).

{95}   This presumption "'can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction.'" *Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family Ltd. P'ship*, 2007 NCBC 7 ¶ 22 (N.C. Super. Ct. Mar. 5, 2007), http://www.ncbusinesscourt.net/opinions/2007%20NCBC%207.pdf (*quoting Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001)).

{96}   To rebut this presumption, a plaintiff must present "more than bare allegations of breaches of fiduciary duties on the part of directors." *Id.* at ¶ 23. Specifically, in order to survive a motion to dismiss, the Complaint "'must allege, in other than conclusory terms, that the board was inattentive or uninformed, acted in bad faith, or that the board's decision was unreasonable.'" *Id.* (*quoting Winters v. First Union Corp.*, 2001 NCBC 8 ¶ 17 (N.C. Super. Ct. July 13, 2001), http://www.ncbusinesscourt.net/opinions/2001%20NCBC%208.htm).

{97}   Additionally, "if a board acts for the 'sole purpose of thwarting a shareholder vote,' the business judgment rule does not apply, and the board must prove it had a 'compelling justification for such action.'" *First Union Corp. v. SunTrust Banks, Inc.*, 2001 NCBC 9A ¶ 47 (N.C. Super. Ct. Aug. 10, 2001), http://www.ncbusinesscourt.net/opinions/2001%20NCBC%209A.pdf (*quoting Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 661–62 (Del. Ch. 1988)).

E.

CONSTRUCTIVE FRAUD

{98}   Constructive fraud arises in circumstances in which a confidential relationship exists. *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981). A presumption of fraud "arises upon a breach of a confidential or fiduciary relationship." *Id.* (*quoting Rhodes v. Jones*, 232 N.C. 547, 548–49, 61 S.E.2d 725, 726 (1950)).

{99} Specifically,

> [a] constructive fraud claim requires proof of circumstances: "(1) which created the relation of trust and confidence [the 'fiduciary' relationship], and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981) (citation omitted). Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty.

*Governor's Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 249–50, 567 S.E.2d 781, 787–88 (2002) (*quoting Keener Lumber*, 149 N.C. App. at 28, 560 S.E.2d at 824).

{100} Thus, if Plaintiffs have stated a claim for breach of fiduciary duty *vis-à-vis* the Company, they have also stated a claim for constructive fraud.

F.

EQUITABLE REMEDIES

1.

UNJUST ENRICHMENT

{101} In North Carolina, a claim for unjust enrichment lies "'wherever one man has been enriched or his estate enhanced at another's expense under circumstances that, in equity and good conscience, call for an accounting by the wrongdoer.'" *Ellis Jones, Inc. v. W. Waterproofing Co.*, 66 N.C. App. 641, 646, 312 S.E.2d 215, 218 (1984) (*quoting Thormer v. Lexington Mail Order Co.*, 241 N.C. 249, 252, 85 S.E.2d 140, 143 (1954)).

{102} Unjust enrichment is "'a general principle, underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself [or herself] at the expense of another.'" *Ivey v. Williams*, 74 N.C. App. 532, 534, 328 S.E.2d 837, 839 (1985) (*quoting* 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3, at 945 (1973)).

2.

## RESCISSION & DECLARATORY JUDGMENT REMEDIES

{103} A court may order the rescission of an agreement that was induced by fraud or mistake. *See Mills v. Dunk*, 263 N.C. 742, 746, 140 S.E.2d 358, 361 (1965).

{104} As for the right to a declaratory judgment in North Carolina, pursuant to statute, any person with a legal interest in a "written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising [thereunder] and obtain a declaration of rights, status, or other legal relations thereunder." N.C. Gen. Stat. § 1-254 (2007).


## V.

## ANALYSIS

## A.

## EXCULPATION CLAUSE

{105} Defendants contend the Court should dismiss all claims alleged against them because of the exculpation clause included in the Company's Articles.

{106} Pursuant to paragraph 6 of the Company's Articles:

> A director of the corporation shall not be personally liable to the corporation or otherwise for monetary damages for breach of any duty as a director, except for liability with respect to (i) acts or omissions that the director at the time of such breach knew or believed were clearly in conflict with the best interests of the corporation; (ii) any liability under [N.C. Gen. Stat.] § 55-8-33 [pertaining to unlawful distributions]; or (iii) any transaction from which the director derived an improper personal benefit. . . . [T]he liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the North Carolina Business Corporation Act [in the event it is amended to allow further limitations on liabilities].

(Compl., Ex. A.)

{107} In this case, however, Plaintiffs have alleged that Defendants engaged in transactions "from which [they] derived an improper personal benefit" (Compl., Ex. A), and in which self-dealing was involved. For example, Plaintiffs allege the Board

issued 140,000 shares each to Condra and Prevost "at a stated price well below its market value or fair value" in order to "ensur[e] that the board could protect itself from being unseated." (Compl. ¶ 42.)

{108} Accepting these allegations as true, neither the exculpation clause in the Company's Articles nor North Carolina law insulate Defendants from liability in this instance. As such, the Court declines to dismiss the claims alleged against Defendants on this ground.

B.

DERIVATIVE CLAIMS

{109} In their reply brief, Defendants contend that "Plaintiffs did not make an adequate demand on the MedOasis Board because [their] Demand Letter does not reference what is now claimed in Plaintiffs' derivative causes of action." (Reply Supp. Defs'. Mot. Dismiss 3.)

{110} According to Defendants, Plaintiffs' purported demand letter focused on the alleged violations by the Board of Green and Ellington's individual rights as shareholders and not on the derivative claims that are the gravamen of the Complaint. (Reply Supp. Defs'. Mot. Dismiss 3.)

{111} For that reason, Defendants insist that the demand letter "lacks the 'clarity and particularity' necessary to allow the MedOasis Board an opportunity to 'assess its rights and obligations and determine what action is in the best interest of the company.'" (Reply Supp. Defs'. Mot. Dismiss 4 (*quoting Greene v. Shoemaker*, 1998 NCBC 4 ¶ 18 (N.C. Super. Ct. Sept. 24, 1998), http://www.ncbusinesscourt.net/opinions/1998%20NCBC%204.htm).)

{112} Defendants did not state as a basis for dismissal the inadequacy of Plaintiffs' demand letter in their written Motion, but rather only addressed this ground as an afterthought in their reply brief. North Carolina law generally requires that all "application[s] to the court for an order shall be by motion which . . . shall be made in writing, *shall state with particularity the grounds therefor*, and shall set forth the relief or order sought." N.C. R. Civ. P. 7(b)(1) (2007) (emphasis added).

{113} Nevertheless, "because standing is a 'necessary prerequisite to a court's proper exercise of subject matter jurisdiction,' a challenge to standing may be made at any time." *Crouse v. Mineo*, 189 N.C. App. 232, 236, 658 S.E.2d 33, 36 (2008) (*quoting Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878–79 (2002)).

{114} After reviewing carefully the demand letter attached as Exhibit A to Defendants' opening brief, the Court is satisfied that Plaintiffs' pre-suit demand was sufficient to permit the Board to assess the claims asserted in the Complaint.

{115} The demand letter summarizes the purportedly unlawful acts undertaken by the Board in (1) forcing a redemption of Ellington's shares, (2) refusing to allow Ellington to vote his shares and those of his proxies at the 18 August 2008 shareholder meeting, (3) issuing 280,000 shares of stock to Condra and Prevost without adequate consideration and with the express intent of solidifying the Board's control of the Company, and (4) refusing to allow a vote on Ellington's third motion to elect a new Board.

{116} These same allegations form the basis of Plaintiffs' derivative claims. Accordingly, because Plaintiffs' pre-suit demand was adequate as a matter of law, the Court **DENIES** the Motion to Dismiss on this ground and turns to an analysis of the legal sufficiency of the claims pled in the Complaint.

1.

COUNT I—ACCOUNTING

{117} Plaintiffs seek an accounting of

> all stock issues or grants made to Defendants, including, without limitation, the dates of the issuance grants [sic], the amounts of the issuance/grants, the value of the issuance/grants, the recipients of the issued stock/grants, as well as the disposition of any proceeds received by the Defendants and any loans to said Defendants as well as repayments of such loans.

(Compl. ¶ 66.)

{118} The Court holds that it may order an accounting as an equitable remedy if Plaintiffs are able to make out their claims for breach of fiduciary duty or constructive fraud.

{119} Accordingly, Defendants' Motion to Dismiss is **DENIED** as to Count I of Plaintiffs' Complaint.

2.

COUNT II—BREACH OF FIDUCIARY DUTY

{120} Plaintiffs allege that Defendants breached their fiduciary duty to the Company (acting in their individual capacities and/or via a conspiracy) by formulating a plan to allow Defendants to remain entrenched on the Board. (Compl. ¶¶ 68–69.)

{121} As part of this plan, Plaintiffs allege Defendants terminated the AAA Management Services Agreement and issued 280,000 shares to Condra and Prevost at a price well below market value, all of which was done to allow them to remain in control of MedOasis. (Compl. ¶¶ 30, 42.)

{122} If Plaintiffs can prove these allegations, Defendants will, in fact, be liable for a breach of their fiduciary duty to discharge their duties in "good faith," which includes a responsibility to act with undivided loyalty to the Company. *See generally Madvig v. Gaither*, 461 F. Supp. 2d 398, 408 (W.D.N.C. 2006).

{123} Furthermore, because Plaintiffs assert that Defendants' sole purpose in taking these actions was to thwart a shareholder vote, the normal presumptions of the business judgment rule do not apply. *See First Union*, 2001 NCBC 9A ¶ 47 (*quoting Blasius Indus.*, 564 A.2d at 661–62).

{124} Put another way, Plaintiffs have alleged, "'in other than conclusory terms, that the board . . . acted in bad faith,'" thus sufficiently rebutting the deference normally afforded a Board by the business judgment rule. *Wachovia Capital Partners*, 2007 NCBC 7 ¶ 23 (*quoting Winters*, 2001 NCBC 8 ¶ 17).

{125} Accordingly, Defendants' Motion to Dismiss is **DENIED** as to Count II of Plaintiffs' Complaint.

3.

## COUNTS III & VI—ABUSE OF CONTROL & CORPORATE WASTE

{126} In Counts III and VI of the Complaint, Plaintiffs purport to state causes of action for two (2) derivative claims against all Defendants: (1) abuse of control; and (2) corporate waste.

{127} Defendants contend, however, that claims for abuse of control and corporate waste are not recognized as independent torts in North Carolina. (Mem. Law Supp. Defs'. Mot. Dismiss 13.)

{128} The Court agrees.

{129} Plaintiffs actually admit as much in their opposition brief when they state, "[e]ven assuming, *arguendo*, that [abuse of control, gross mismanagement, and corporate waste] are not often pled, *they are all varieties of breach of fiduciary duty*." (Pls'. Mem. Law Opp'n Defs'. Mot. Dismiss 21 (second emphasis added).) Nevertheless, Plaintiffs request leave to restate these claims as general breaches of fiduciary duty. (Pls'. Mem. Law Opp'n Defs'. Mot. Dismiss 21 n.14.)

{130} The Court concludes that the claims are fully encompassed in Plaintiffs' derivative claims for breach of fiduciary duty, gross mismanagement, and constructive fraud (Counts II, IV, and V). As a result, it would serve no purpose to allow Plaintiffs leave to restate the claims.

{131} Accordingly, Defendants' Motion to Dismiss is **GRANTED** as to Counts III and VI, and Plaintiffs' request for leave to restate these claims is **DENIED**.

4.

## COUNT IV—GROSS MISMANAGEMENT

{132} As with Plaintiffs' claims for abuse of control and corporate waste, Defendants contend that North Carolina does not recognize gross mismanagement as an independent tort. (Mem. Law Supp. Defs'. Mot. Dismiss 13.)

{133} This claim, however, essentially alleges that Defendants violated their statutory duty of care with respect to the transactions at issue. *See* N.C. Gen. Stat. § 55-8-30(a)(2) (2007) (requiring a corporate director to discharge his duties "[w]ith the care an ordinarily prudent person in a like position would exercise under

similar circumstances").  Furthermore, our courts have recognized that a claim for gross mismanagement against a director is a proper derivative claim.  *See Corp. Comm'n of N.C. v. Merchants' Bank & Trust Co.*, 193 N.C. 113, 115, 136 S.E. 362, 363 (1927).

{134} Plaintiffs allege Defendants abdicated their duties to the Company by terminating a lucrative management contract with AAA, a principal shareholder, and by issuing shares to Condra and Prevost at a discounted price, all in an attempt to avoid being unseated as Board members.  (Compl. ¶¶ 30, 42.)

{135} Plaintiffs also allege Defendants failed to (1) provide "even the most basic financial information to its shareholders" and (2) hold required shareholder meetings, at which the Company's shareholders should have been given an opportunity to vote for new Board members.  (Compl. ¶ 24.)

{136} If true, these facts would make out a claim for gross mismanagement.

{137} Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Count IV of Plaintiffs' Complaint.

5.

COUNT V—CONSTRUCTIVE FRAUD

{138} In Count V, Plaintiffs allege Defendants committed constructive fraud by, among other things, making and/or concealing "material facts from MedOasis shareholders despite their duties to . . . disclose the true facts regarding their stewardship of MedOasis."  (Compl. ¶ 83.)

{139} In order to adequately allege a claim for constructive fraud, "a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty." *Governor's Club*, 152 N.C. App. at 249–50, 567 S.E.2d at 788 (*quoting Keener Lumber*, 149 N.C. App. at 28, 560 S.E.2d at 824).

{140} Because the Court has already determined that Plaintiffs have alleged a proper derivative claim for breach of fiduciary duty, the Court holds that they may also proceed on their derivative claim alleging constructive fraud.

{141} Furthermore, the Court holds that Plaintiffs have sufficiently pled the operative facts surrounding the alleged constructive fraud, so as to put Defendants on notice of the claim.

{142} Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Count V of Plaintiffs' Complaint.

6.

COUNT VII—UNJUST ENRICHMENT

{143} In Count VII, Plaintiffs allege that, as a result of Defendants' actions, which served to entrench them on the Board, "Defendants will be and have been unjustly enriched at the expense of MedOasis, in the form of unjustified salaries, benefits, bonuses, stock issues or grants and other emoluments of office." (Compl. ¶ 89.)

{144} The Court holds that Plaintiffs have stated a claim for unjust enrichment.

{145} In sum, Plaintiffs allege that Defendants unlawfully circumvented Plaintiffs' voting rights so as to retain their seats on the Board, and, as a result, Defendants will continue to receive salaries, benefits, bonuses, stock issues, etc., at the Company's expense and "under circumstances where it would be unfair for [Defendants] to retain [these benefits] without [the Company] being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984).

{146} These allegations are sufficient to make out a claim for unjust enrichment. Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Count VII of Plaintiffs' Complaint.

7.

COUNT VIII—RESCISSION

{147} In Count VIII, Plaintiffs allege that Defendants committed fraud when they issued shares to Condra and Prevost and seek to have "[a]ll contracts which provide for issuance of stock to the Officer Defendants . . . rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void." (Compl. ¶¶ 93–94.)

{148} The Court may order rescission of these contracts if they were, in fact, induced by fraud. *See Mills*, 263 N.C. at 746, 140 S.E.2d at 361.

{149} Moreover, because the Court has already determined that Plaintiffs have stated a valid cause of action for constructive fraud, Plaintiffs may be entitled to rescission of the contracts relating to the issuance of these shares.

{150} Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Count VIII of Plaintiffs' Complaint.

## C.

### INDIVIDUAL CLAIMS FOR BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD

{151} In Counts IX and X, Plaintiffs purport to state direct claims for breach of fiduciary duty and constructive fraud against Defendants.

{152} In Count IX, Plaintiffs allege that Defendants engaged "in a deliberate course of action designed to dilute the ownership interest of the Plaintiffs, squeeze out the interests of the Plaintiffs and allow Defendants to maintain their control of the Company in pursuit of their own self-interest, in breach of fiduciary duties the Defendants owed to the Plaintiffs." (Compl. ¶ 96.)

{153} In Count X, Plaintiffs allege that Defendants, as corporate fiduciaries, "owed to Plaintiffs a duty of candor and full and accurate disclosure regarding the true state of MedOasis' business and assets" and that, by failing to uphold these duties, "they have committed constructive fraud and violated their duty of candor." (Compl. ¶¶ 101–02.)

{154} As noted earlier, however, in North Carolina, directors generally owe a fiduciary duty to the corporation and not to any individual shareholders. Thus, where a plaintiff in North Carolina alleges that the defendant-directors have breached a fiduciary duty, the claim generally is a derivative claim. *Perry*, 149 N.C. App. at 26, 560 S.E.2d at 822.

{155} Nevertheless, a claim should not be dismissed pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure merely because it is mislabeled so long

as the factual allegations give rise to a claim under some valid legal theory. *Stanback*, 297 N.C. at 202, 254 S.E.2d at 625.

{156} At the heart of the Complaint in this case is the contention that the Board thwarted Plaintiffs' right to participate in control of the Company by refusing to allow Plaintiffs to vote their shares (and those granted to them by proxy) at the 18 August 2008 special shareholders' meeting, and that the Board took other steps to entrench itself in office.

{157} The Court notes that Plaintiffs' right to vote their shares is specifically recognized by statute. *See* N. C. Gen. Stat. § 55-7-21(a) (2007) (stating that "unless the articles of incorporation provide otherwise, each outstanding share, regardless of class, is entitled to one vote on each matter voted on at a shareholders' meeting").

{158} Moreover, where (as here) a plaintiff shareholder alleges that Company stock was issued for grossly inadequate consideration and primarily for entrenchment purposes, the claim "may state either an individual or derivative claim." *Avacus Partners, L.P. v. Briani* Civil Action No. 11001, 1990 Del. Ch. LEXIS 178, at *22 (Del. Ch. Oct. 24, 1990) (stating that claims of entrenchment may be either individual or derivative or both and that "a claim that the board improperly acted to entrench itself by issuing stock that impacts the shareholders' voting power may state either an individual or a derivative claim").

{159}  The Court construes Counts IX and X of the Complaint as asserting statutory violations of Plaintiffs' right to vote their shares at the 18 August 2008 shareholders' meeting, which the Court holds are properly pled as individual claims.  Accordingly, the Court **DENIES** the Motion to Dismiss these claims.

D.

COUNT XI—DECLARATORY JUDGMENT[8]

{160} Defendants next seek dismissal of Plaintiffs' request for a declaratory judgment as to issues raised by the Complaint.

{161} Plaintiffs, however, have stated a justiciable controversy in that they allege their statutory rights as shareholders were purportedly violated by the

---

[8] This Count is incorrectly labeled as "Count IX" in the Complaint.

following actions of the Defendant Board members: (1) diluting Plaintiffs' voting rights by improperly issuing shares to Condra and Prevost (Compl. ¶¶ 41–43); (2) prohibiting Ellington's right to vote his shares at the shareholder meeting (Compl. ¶ 49); (3) failing to provide any financial information about the Company to the shareholders (Compl. ¶ 24); and (4) unlawfully attempting to exercise redemption rights in violation of North Carolina law (Compl. ¶¶ 30–36).

{162} Based on the allegations of the Complaint, the Court has the authority to declare Plaintiffs rights, status, and legal relations, as they are affected by North Carolina corporation law and/or any contracts involving the allegedly improperly issued shares. *See* N.C. Gen. Stat. § 1-254 (2007).

{163} Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Count XI of Plaintiffs' Complaint.

### E.

### DEFENDANT MILLER

{164} Defendant Miller seeks dismissal of all claims asserted against him because he contends he was not a director or officer at the time of the actions taken by the Board in or around August 2008. (Mem. Law Supp. Defs'. Mot. Dismiss 19.)

{165} In this case, however, the Complaint alleges, among other things, that all Defendants "have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan . . . [to] maintain Defendants' executive and directorial positions at MedOasis and the profits, power and prestige which Defendants enjoyed as a result of these positions." (Compl. ¶¶ 59, 60.)

{166} In essence, and although not expressly styled as such, Plaintiffs here allege a civil conspiracy among the Defendants, including Miller.[9]

---

[9] Because Miller contends he was not a director or officer at the time of the alleged conspiracy, the doctrine of intracorporate immunity does not apply. *See generally State ex. rel. Cooper v. Ridgeway Brands Mfg., LLC*, 184 N.C. App. 613, 625, 646 S.E.2d 790, 799 (2007) (stating that a corporation cannot conspire with itself and that an allegation that a corporation is conspiring with its agents, officer, or employees is tantamount to alleging that a corporation is conspiring with itself), *aff'd in part, rev'd in part, and remanded by State ex. Rel. Cooper v. Ridgeway Brands, Mfg., LLC*, 362 N.C.431, 666 S.E.2d 107 (2008).

{167} In that regard, North Carolina law provides that where a party seeks

> recovery for injury caused by acts committed pursuant to a conspiracy, . . . the combination or conspiracy charged does no more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under the proper circumstances the acts of one may be admissible against all.

*Henry v. Deen*, 310 N.C. 75, 86–87, 310 S.E.2d 326, 334 (1984) (*citing Shope v. Boyer*, 268 N.C. 401, 150 S.E.2d 771 (1966); *Muse v. Morrison*, 234 N.C. 195, 66 S.E.2d 783 (1951)).  The gravamen of the action, however, is the resultant injury, and not the conspiracy itself.  *Muse*, 234 N.C. at 198, 66 S.E.2d at 785 (*quoting Holt v. Holt*, 232 N.C. 497, 500, 61 S.E.2d 448, 451 (1950)).

{168} Thus, Miller is not entitled to dismissal at this stage of the proceedings because, if the evidence supports Plaintiffs' contentions, Plaintiffs would be entitled to an instruction at trial on the law of conspiracy in order to associate together Miller and the other individual Defendants for the purpose of establishing joint and several liability.  *See* N.C. Pattern Jury Instructions—Civil 103.31 (2009).

{169} Accordingly, the Court **DENIES** Miller's Motion to Dismiss him as a party-defendant.


VI.

CONCLUSION

{170} The Court **GRANTS** Defendants' Motion to Dismiss Counts III and VI of the Complaint, as the Court holds that these claims are not recognized in North Carolina, and, in any event, the facts alleged therein are subsumed within Plaintiffs' claims alleging a breach of fiduciary duty.

{171} The Court **DENIES** the Motion to Dismiss as to all other claims.

**SO ORDERED**, this the 14th day of August, 2009.